In re George L. SENTY, Debtor.

CITIBANK (SOUTH DAKOTA), N.A., Diners Club Incorporated and Diners Club Incorporated, as successor in interest to Carte Blanche Corporation, Plaintiffs,

v.

George L. SENTY and Ira S. Greene, Interim Trustee, Defendants.

Bankruptcy No. 82 B 12115.
Adv. No. 83–5239A.

United States Bankruptcy Court,
S.D. New York.

Aug. 14, 1984.

Harvis & Zeichener, New York City, for Citibank, N.A. et al.

Martin Siegel, New York City, for George Senty.

## DECISION

HOWARD C. BUSCHMAN, III, Bankruptcy Judge.

Citibank (South Dakota), N.A. ("Citibank"), Diners Club, Inc. ("Diners Club") and Diners Club, Inc. as successor in interest to Carte Blanche Corporation ("Carte Blanche") (collectively the "Plaintiffs") filed a complaint against George L. Senty ("Debtor") on March 4, 1983 to determine whether debts incurred by the debtor and owed to the Plaintiffs should be declared nondischargeable under 11 U.S.C. § 523(a)(2)(A) of the Bankruptcy Code (the "Code"). The Debtor had incurred credit charges in excess of $60,000, over roughly a three month period, while he was travelling through Europe. Shortly after his return to America, he filed for bankruptcy. The Plaintiffs timely served and filed their complaint and a trial on the question of nondischargeability was held and concluded on October 5, 1983 before the late Honorable John J. Galgay. Counsel to the parties have informed the Court of their willingness that the matter be submitted, on the record, to and decided by, the undersigned.

**I**

The Debtor filed a Chapter 7 petition on November 3, 1982. In his schedules he listed a total indebtedness of $93,407.62 and assets including $100.00 cash on hand and $1,500 in personalty. He also reported that in the year prior to filing his petition he suffered no losses, did not repay any loans or transfer any property to third parties. He failed to state any income for 1980 and 1981.

Prior to the filing of his petition, the Debtor had been issued a Citibank Master-Card credit card, a Diners Club credit card, and a Carte Blanche credit card. Each card was issued to the Debtor pursuant to certain retail installment agreements which provided that his use of the credit cards carried with it an obligation to repay the Plaintiffs any credit extended to him. In addition the Debtor's MasterCard was limited by a credit line of $1,200.00.

Of the $62,371.96 credit charges the Plaintiffs claim are nondischargeable, approximately $50,000 were charged roughly during July through September of 1982, just prior to the November 1982 petition. Most, if not all, of these charges were incurred while the Debtor was travelling through Europe, where billing is delayed, and engaging in what can be only be termed a shopping spree. Prior to this period, the Debtor's use of his cards was moderate. The records of the Debtor's general account history as of July of 1982 reflect outstanding charges of $1,060.85, $309.81 and $258.12 owing to Citibank, Diners Club and Carte Blanche, respectively. During the month of July, and thereafter, the activity in all three accounts jumped significantly and dramatically.[1] During that period, charges, interest and late fees of $6,913.25, $51,617.68, and $2,212.25, respectively were incurred. From the schedules it appears that the Debtor incurred

---

1. The Debtor's documented account history, prepared for each account and submitted into evidence, runs as far back as January 1982 for his Citibank MasterCard account; November 1981 for his Diners Club account; and June 1982 for his Carte Blanche account.

In general, a period of at least one (1) month separated the time the charges were actually incurred and the time they appeared on the Debtor's account statement.

these subsequent charges at a time when he had no apparent means of repaying them.

The Plaintiffs filed their complaint on March 4, 1983, the last date set by this Court for objections to the Debtor's discharge and to the dischargeability of individual debts. They seek judgment declaring the following sums nondischargeable: Citibank $7,974.10; Diners Club $51,927.49; Carte Blanche $2,470.37 and that judgment be entered enabling them to recover said sums, together with interest from August 1, 1982. They further seek to be awarded attorney's fees of up to 20% of the debts in question as provided in the retail purchase agreements, making a total amount claimed of $74,846.35.

The Debtor generally denies the Plaintiffs allegations. He further contends that since he was discharged on March 16, 1983, the Plaintiffs are estopped from seeking to enforce the debts in question since those debts have been legally discharged.[2]

## II

■ The Debtor's contention that the Plaintiffs are estopped from having their claims declared nondischargeable as a result of the Debtor's being properly discharged on March 16, 1983, is without merit. The Court set March 4, 1983 as the last day for objecting to the Debtor's discharge or to the dischargeability of individual debts. The Plaintiffs in this case timely

filed their complaint objecting to dischargeability on March 4, 1983. The complaint was served on the Debtor by mail on March 10, 1983. Since the Plaintiffs timely filed their complaint, see § 523(c), the Debtor's discharge of March 16, 1983 did not affect their claims and, therefore, the Plaintiffs are not estopped from having their complaint heard on the merits.[3]

## III

■ The burden of proof in determining the nondischargeability of a debt under section 523(a)(2)(A)[4] is on the petitioning creditor and the creditor must meet this burden with clear and convincing evidence. *In re Buford*, 25 B.R. 477, 480–1 (Bankr.S. D.N.Y.1982). The creditor, however, does not have the burden to disprove all explanations. *In re Waldman*, 33 B.R. 328, 330 at note 2 (Bankr.S.D.N.Y.1983). Upon the establishment of a prima facie case that a debt is nondischargeable, the burden shifts to the Debtor to go forward and offer a credible explanation. *Id.* at 330 note 2. Since the Debtor offered no evidence explaining his activity, this Court need only determine if the evidence adduced at trial was sufficient to establish a prima facie case under 11 U.S.C. § 523(a)(2)(A).

## IV

■ Section 523(a)(2)(A), in its use of the terms "false pretenses, false represen-

---

**2.** The Debtor also maintains that since the Plaintiffs failed to attend the first meeting of creditors on December 8, 1982, and that since the debts in question were incurred more than ninety (90) days prior to his petition in bankruptcy, the debts cannot be declared nondischargeable. Neither of these arguments have any merit either in law or in logic and therefore need not be seriously considered by the Court.

**3.** The order of discharge entered by the Court on March 16, 1983 states in pertinent part:
  ... it is ordered that:
  1. The above-named debtor is released from all dischargeable debts.
  2. Any judgment heretofore or hereafter obtained in any court other than this court is null and void as a determination of the personal liability of the debtor with respect to any of the following:

...(b) unless heretofore or *hereafter* determined by order of this Court to be nondischargeable, debts alleged to be excepted from discharge under clauses (2), (4) and (6) of 11 U.S.C. § 523(a);... (emphasis added).

**4.** 11 U.S.C. § 523 states, in relevant part:
  (a) A discharge under section 727...of this title *does not discharge an individual debtor* from any debt—

  .    .    .    .    .

  (2) for obtaining money, property, services, or an extension, renewal or refinance of credit, by
  (A) False pretenses, a false representation or actual fraud, other than a statement respecting the debtor's or an insider's financial condition...

tation [and] actual fraud," is not written on a clean slate. The use of common legal terms in a related context strongly implies incorporation of the shades of meaning those terms have been given and the elements they prescribe. A case in fraud at common law requires proof of a material misrepresentation, knowingly made with intent to deceive, which statement is reasonably relied on by the plaintiff to its detriment. Prosser, Torts (4th Ed.) § 105 pp. 685–6 (1971). At common law the trier of fact may, but is not required to, find scienter on the basis of gross recklessness in light of all the evidence, *State Street Trust Co. v. Ernst*, 278 N.Y. 104, 15 N.E.2d 416 (1938); *accord In re Buford*, 25 B.R. 477, 481 (Bankr.S.D.N.Y.1982); *In re Schnore*, 13 B.R. 249, 252 (Bankr.W.D.Wis.1981).

■ Because of the requirement in § 523(a)(2) that only a written representation of financial condition may serve as the basis for finding nondischargeability, care must be taken to determine the exact nature of the misrepresentation claimed. In this regard, § 523(a)(2) can be seen as partially overruling *Davison-Paxon Co. v. Caldwell*, 115 F.2d 189 (5th Cir.1940), *cert. denied*, 313 U.S. 564, 61 S.Ct. 841, 85 L.Ed. 1523 (1941), which in its holding that a representation of financial condition could not form the basis for denying discharge, had been criticized. *See First Nat. Bank of Mobile v. Roddenberry*, 701 F.2d 927, 931–2 (11th Cir.1983). But it remains true under the Code that oral or implied representations of financial condition, alone, are not actionable under § 523(a)(2).

## V

With these notions before us, we thus turn to the present case. Here as in most credit card cases, there are a variety of representations implied by the user's conduct at various stages of the transaction: (i) a present intention to carry out the terms of the contract, made upon entering into it; (ii) a present intention to pay the charges and (iii) an ability to do so, both of which are made at the time of presentation of the card as payment for goods and ser-

vices. *See In re Pannell*, 27 B.R. 298, 302 (Bankr.E.D.N.Y.1983), *In re Hutchinson*, 27 B.R. 247, 250 (Bankr.E.D.N.Y.1983), *In re Stewart*, 7 B.R. 551, 554 (Bankr.M.D.Ga. 1980), *In re Poteet*, 12 B.R. 565, 567 (Bankr.N.D.Tex.1981). While the last representation, that the user has the ability to pay the charge at the time it is incurred, may not be actionable under § 523(a)(2) because it is an unwritten representation of financial condition, there can be no doubt as to the materiality of a representation of intention to pay.

■ On this record, the evidence shrieks of an intention not to pay. The exponential increase in charges in the last months before bankruptcy over those consistently incurred previously, when coupled with the Debtor's apparent lack of income, is prima facie evidence of a lack of intention to repay demanding an explanation or rebuttal. None was offered here. The same evidence also relates to intent to deceive. A debtor's state of mind at the time of the credit card purchases is necessarily difficult to prove. Since few will admit to a fraudulent intent, in most cases the requisite intent must be established by resort to circumstantial evidence. *In re Pannell*, 27 B.R. 298, 302 (Bankr.E.D.N.Y.1983), *In re Stewart*, 7 B.R. 551, 554–5 (Bankr.M.D.Ga. 1980). Courts have generally held that a debtor's intent to deceive may be inferred upon proof that the debtor knew or should have known of his insolvency and inability to repay the charges incurred. *In re Buford*, 25 B.R. 477, 481 (Bankr.S.D.N.Y. 1982). At this point the burden shifts to the Debtor to show that he did not possess such an intent. *See In re Buford*, 25 B.R. 477 (Bankr.S.D.N.Y.1982) (Debtor showed that she was financially unsophisticated, had regularly paid billed charges up to filing her petition, and actually was unaware of her insolvency).

■ Courts have listed factors that assist in determining whether an intent to deceive may be inferred, *See, e.g. In re Stewart*, 7 B.R. 551, 555 (Bankr.M.D.Ga. 1980); *In re Buford*, 25 B.R. 477, 482 (Bankr.S.D.N.Y.1982). These factors are

not exhaustive, of course, and need not all be met for "the question of intent is an issue of fact to be decided with relationship to the facts of the particular case before the Court." *In re Pannell,* 27 B.R. 298, 302 (Bankr.E.D.N.Y.1983). To be sure, the age and sophistication of the debtor; the length of time between the charging and filing for bankruptcy; the debtor's incurring charges subsequent to consultation with an attorney regarding the filing of a bankruptcy petition; the number of charges made; the amount of each charge; the financial condition of the debtor at the time he incurred the charges; the extent to which the credit limit of the account is exceeded; and the possibility that items purchased were necessaries and not of a luxurious nature; are all valuable indicators of whether the intent to deceive exists. *See In re Buford,* 25 B.R. 477, 482 (Bankr. S.D.N.Y.1982); *see also, In re Brashears,* 12 B.R. 136, 137 (Bankr.S.D.Miss.1981); 11 U.S.C. § 523(a)(2)(A) (1984). Not all need be met; the trial court must weigh all the factors in the case before it and determine if the evidence as a whole clearly and convincingly establishes that the Debtor intended to deceive its creditors.

In the case at bar, the Plaintiffs have introduced evidence sufficient to establish their claims of nondischargeability with respect to those debts incurred during and after July of 1982. The facts, as previously discussed, clearly indicate the Debtor's intent to deceive. The magnitude of the charges made during the three month period, that they were incurred in travel, the lack of ability to pay, the gross disparity between those charges and the Debtor's prior payment pattern and that they were incurred overseas where billing is delayed constitute prima facie evidence of intent. This is not a case of negligent failure to pay bills; nor is it a case of even a reckless incurring-of charges or of the often present but usually unfounded optimism of the impoverished. *In re Buford,* 25 B.R. 477, 482 (Bankr.S.D.N.Y.1982).

Since the misrepresentation here concerns the Debtor's tender of the card as payment, the issue of reliance by the issuers of the card who have direct knowledge of the misrepresentation, would seem to present a conceptual difficulty. But the issuer, having paid the charges incurred by the card holder has become subrogated to the debt and is entitled to claim the reliance of the provider of goods and services. Furthermore, the credit card system functions upon the user's guarantee of payment for charges on its cards. The Debtor, in presenting the card and thereby forcing the issuer to honor its guarantee to merchants necessarily compelled reliance by the issuer.

To the extent that *First Nat. Bank of Mobile v. Roddenberry,* 701 F.2d 927 (11th Cir.1983), would impose a requirement of revocation of the card, it is rejected. In *Roddenberry* it was stated and held that:

> The element of risk is inherent in the issuance of bank credit cards. Our "credit economy" encourages widespread voluntary risk-taking on the part of those issuing cards... Banks are willing to risk non-payment of debts because that risk is factored into the finance charges... [W]e hold that the voluntary assumption of risk on the part of a bank continues until it is clearly shown that the bank unequivocally and unconditionally revoked the right of the cardholder to further *possession and use of the card,* and until the cardholder is aware of this revocation... Only after such clear revocation has been communicated to the cardholder will further use of the card result in liabilities obtained by "false pretenses or false representations" within the meaning of section 17 a(2)'s exemption from discharge.

*First Nat. Bank of Mobile v. Roddenberry,* 701 F.2d 927, at 932 (11th Cir.1983). Although *Roddenberry,* a case under the former Bankruptcy Act, has been said to have limited application to cases brought under the Bankruptcy Code, *In re Wilson,* 32 B.R. 772, 776 (Bankr.E.D.Tenn.1983), that is not the reason for its rejection here. Like the Utah Supreme Court "in our opinion justice is better served by placing the responsibility for the credit escapades of an

errant spouse (or son, daughter, mother, father, etc.) on the cardholder rather than the bank." *Walker Bank & Trust Co. v. Jones,* 672 P.2d 73, 76 (Utah 1983).

> Moreover, if the *Roddenberry* holding provides that banking card purchases previous to receipt of notification of revocation of authorized use are dischargeable *per se,* without regard to actual fraudulent intent on the part of the card user, the holding may go too far. Code § 523(a)(2)(A) is unambiguous: Debts for obtaining property or services through actual fraud or false representations (other than through the use of a false financial statement) are nondischargeable. (footnote omitted) (emphasis added)

*In re Wilson,* 32 B.R. at 776.

Furthermore, *Roddenberry* involved a husband who might have been held liable for the debts incurred by his wife, from whom he was separated, even though he kept his promise to the bank that he would make no further charges. Such a situation is hardly analogous to a case where the debtor seeks to discharge debts he incurred by his own fraud.

If the premise of the *Roddenberry* court is that a debtor whose card has been stolen or is being misused by others should be entitled to a discharge of obligations so incurred, we agree. No *per se* rule of revocation is necessary to recognize that such debts, absent other proof, are not incurred by the debtor's fraud.

In addition, if a card issuer's failure to revoke lies in negligence, it would be unjust, on that basis, to so excuse fraud, *See, In re Vegh,* 14 B.R. 345, 348 (Bankr.S.D. Fla.1981), *In re Hutchinson,* 27 B.R. 247, 252 (Bankr.E.D.N.Y.1983). At least recklessness should be required. This Court cannot agree with the *Roddenberry* court's statement that "improvident creditors are not to be afforded special protections in bankruptcy for the assumption of common business risks." *First Nat. Bank of Mobile v. Roddenberry,* 701 F.2d at 932, if that statement includes a debtor's transacting business in bad faith as a common business risk.

■ Nor does the *Roddenberry* court's reliance upon issuer's applying a risk factor when setting finance charges support the rule it attempts to create. Indeed, that practice provides all the more reasons for courts to enforce § 523(a)(2)(A) with great diligence. A failure to enforce this section could result in significantly higher finance charges by encouraging debtors to engage in shopping sprees prior to seeking relief in bankruptcy. Debtors by behaving in this manner would not be using the Bankruptcy Code as the shield it was intended to be, but rather, as a sword with which to slay their creditors. In the final analysis, honest credit card holders would be saddled with the fraudulent debtor's shopping bill in the form of higher finance charges. Therefore, the wording of the Code, the goals of bankruptcy (one of which is to give good faith debtors a fresh start and a second chance to succeed in our society), and public policy all militate against allowing a debtor to discharge fraudulently incurred debts in bankruptcy irrespective of the issuer's mere negligence in failing to revoke the card.

### VI

■ Having prevailed on their claim of nondischargeability, the Plaintiffs seek judgment for their attorney's fees. They contend that the Debtor agreed in the credit agreements to pay their attorney's fees. None of the three agreements, however, specifically contemplates that a cardholder must reimburse the creditor for attorney fees incurred in seeking a determination of nondischargeability in bankruptcy [5] and for the reasons discussed below it appears that an expansive interpretation of these provisions so as to award attorney's fees would be improper.

Congress was extremely reluctant to award attorney's fees to creditors who are

---

5. For example, the Diners Club membership rules provide that "Court costs plus reasonable attorney's fees may be added to any delinquent balance referred to an attorney for collection."

successful in their effort to have debts declared nondischargeable. The legislative history evinces a sharp concern that an award of attorney's fees to prevailing creditors would shift the balance back toward the creditor and induce honest debtors to settle despite the strong merits of their cases. *See In re Woods*, 25 B.R. 16, 17 (Bankr.D.Ore.1982) *quoting* House Report No. 95–595, 95th Cong., 1st Sess., at pages 131 and 132 (1978), U.S.Code Cong. & Admin.News, pp. 5787, 6092. It is significant that Congress did not see fit to provide a method for creditors to recover their attorney's fees under 11 U.S.C. § 523(d).[6]

These concerns give great hesitancy to interpreting a general agreement to pay attorney's fees if the balance is referred for collection to include an agreement to pay fees upon a determination of nondischargeability. Indeed, they indicate that a specific agreement to pay such fees might be suspect, a question we need not reach on this record.

The foregoing constitutes this Court's findings of fact and conclusions of law. The Debtor's obligations to Citibank, Diners Club and Carte Blanche for the charges incurred during and after July 1982 together with the interest and late fees on those charges are nondischargeable. The Plaintiff's request for attorney fees should be denied.

SETTLE ORDER ON NOTICE.

---

**6.** Section 523(d) provides:

If a creditor requests a determination of dischargeability of a consumer debt under subsection (a)(2) of this section, and such debt is discharged, the court shall grant judgment against such creditor and in favor of the debtor for the costs of, and a reasonable attorney's fee for, the proceeding to determine dischargeability, unless such granting of judgment would be clearly inequitable.