The FIRST NATIONAL BANK DAYTON, OHIO, One First National Plaza, Dayton, Ohio 45402, Plaintiff,

v.

Lynette J. WRIGHT, aka Lynette J. Johnson, 1629 Tampa Avenue, Dayton, Ohio 45402, Defendant.

In the Matter of Donald E. WRIGHT (and) Lynette J. Wright, aka Lynette J. Johnson, Debtors.

Bankruptcy No. 3–80–00744.
Adv. No. 3–80–0227.

United States Bankruptcy Court, S. D. Ohio, W. D.

Feb. 2, 1981.

William F. Clinard, New Lebanon, Ohio, for defendants.

John M. Slavens, Dayton, Ohio, for plaintiff.

George Ledford, Trustee, Englewood, Ohio.

## FINDINGS OF FACT

CHARLES A. ANDERSON, Bankruptcy Judge.

This matter is before the Court for disposition of the plaintiff's complaint seeking to have its claim against the above debtor determined nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) and (B). The Court held a pretrial conference on September 8, 1980, and the parties endorsed a Joint Pretrial Order at that time. The matter was tried on October 21, 1980. The following decision is based upon the Pretrial Order, the pleadings and the evidence adduced at trial, without arguments or citations of authorities.

The defendant, Lynette J. Wright, formerly Lynette J. Johnson, filed her petition for relief with this Court on March 25, 1980. Mrs. Wright listed the plaintiff, First National Bank of Fairborn, as an unsecured creditor with a total claim of $2,066.54. First National Bank filed a complaint on May 15, 1980 claiming this debt should be declared nondischargeable because the defendant allegedly secured credit from the plaintiff by false pretenses and false representations in that she used her Master Charge card to obtain money and make purchases when she had no ability to pay, or knew or should have known that she had no ability to pay. The Bank claims Mrs. Wright had no intention of paying for these transactions made within three months immediately preceding the filing of her petition. In opposition, the defendant has denied all allegations.

The defendant applied for a Master Charge card from First National Bank on June 11, 1979; the card, bearing the name Lynette J. Johnson, was mailed to her on June 15, 1979. On July 16, 1979, the Bank reissued a card to the defendant in the name of Lynette J. Wright. The record does not contain evidence regarding the defendant's entire credit history with Master Charge. Plaintiff's Exhibits 1 and 4 are copies of monthly statements sent to Mrs. Wright showing purchases she made in the months of November and December, 1979 and January, 1980. The payments for each of these statements were due in December, 1979, January and February, 1980 respectively. According to these documents, the defendant made purchases in November, 1979 amounting to approximately $66.00; there were no December purchases, and January, 1980 purchases amounted to $1,509.00. The transactions in January occurred between January 3 and 17, 1980. Prior to these transactions, Mrs. Wright's balance was $548.00.

The defendant's January, 1980 purchases precipitated the present litigation. The merchants listed on the January statement and the amount of each purchase are as follows:

| 1-03 | Mayors Jewelers | – | 245.58 |
|------|-----------------|---|--------|
| 1-03 | Elder Berrman Stores | – | 146.25 |
| 1-04 | First National Bank Cash– | | 200.00 |
| 1-05 | Webers Jewelers | – | 147.35 |
| 1-11 | Goldmans,Inc. | – | 15.45 |
| 1-11 | Goldmans,Inc. | – | 21.97 |
| 1-11 | Webers Jewelers | – | 254.98 |

| 1-12 | Webers Jewelers | - | 178.70 |
|------|-----------------|---|--------|
| 1-13 | Leroys Keepsake DND CT | - | 231.21 |
| 1-15 | Wilkie News Inc. | - | 8.63 |
| 1-15 | Richs Pawn Shop | - . | 47.03 |
| 1-17 | Cockrel Barber & Beau | - | 12.02 |

We note that most of the purchases were made at jewelry stores; thus, we can infer that the purchases were not for necessaries.

The defendant has been employed by the City of Dayton for approximately two years. Her husband was employed by Hobart Brothers from November, 1978 until on or about January 18, 1980.

Plaintiff's Exhibit 2 is a delinquent account history for the defendant's account. On October 23, 1979, the plaintiff called the defendant relative her delinquent account. There were no other communications after October 25, 1979 until January 16, 1980. On that date, according to the document, Mrs. Wright told the plaintiff she was in the process of filing bankruptcy and referred the plaintiff to her attorney. On January 22, 1980, Mrs. Wright relinquished her Master Charge card to the plaintiff. During a telephone call on that date, when asked about a $200.00 cash advance she had made, the defendant stated she got the money to pay her attorney. During the same call, when asked about a diamond ring which was one of her purchases, she stated that it had already been stolen.

On January 21, 1980, the defendant's home was burglarized, and all the items purchased on the Master Charge card in January were stolen except for wedding rings which she and her husband were wearing. A police report (marked as Joint Exhibit A) states that the means by which the defendant's home was entered was with a pass key. The value of the property taken was estimated at $4,200.00. The defendant told the investigating officer her husband was in Atlanta, Georgia, at the time.

The defendant testified that prior to January, 1980, she obtained an oral extension of credit from the plaintiff in the form of an increase in her credit limit on the Master Charge account. She stated that she did not ask for an application for the increase but, instead talked to a lady on the telephone about the extension. She claims the lady granted the extension over the telephone. She testified that each of the purchases made from the jewelry stores in January were called in by the merchant, and the Bank approved the purchases. Plaintiff's Exhibit 5 is copies of sales slips on the various purchases; there appears to be a number in most of the boxes designated "authorization no". The defendant stated that because these purchases were given an authorization number, she assumed her account was intact.

The plaintiff offered testimony of Frank Maloney, Assistant to the President of the Bank in charge of consumer lending. Mr. Maloney testified that a credit application is required for obtaining an increase in credit limit on a Master Charge card. He also testified that the Bank's policy is not to increase credit limits within the first year a customer has the card.

█ Apparently, the defendant relies heavily on her claim that she received an extension of her credit limit sometime before January; thus, she believes her purchases were properly made. We would disagree with the idea that if the defendant's account had been increased, this would somehow absolve her of misuse of the credit card. If the defendant knew or should have known that she would not be able to pay for the purchases made in January or if she made the purchases with no intention of repayment, it is irrelevant whether she had a credit limit to cover such purchases.

The defendant testified at trial that the first time she saw her attorney regarding filing bankruptcy was the latter part of March or early April, 1980. This testimony conflicts with Plaintiff's Exhibit 2 which indicates that on January 16, 1980, the defendant advised the plaintiff she was in the process of filing bankruptcy and the plaintiff would have to contact her attorney. This can be further refuted by Exhibit 2 wherein the plaintiff notes telephone calls to Mr. Clinard, the defendant's attorney, on January 21, 1980 and February 14, 1980 in

which the parties discussed the defendant's bankruptcy. The defendant also testified that she began contemplating bankruptcy after her husband was unemployed. According to testimony from Robert M. Knight, payroll supervisor at Hobart Brothers, Mr. Wright was terminated January 18, 1980; the defendant also testified that her husband was unemployed as of January 18, 1980. Yet, Exhibit 2 shows that as early as January 16, 1980 the defendant told the plaintiff she was in the process of filing bankruptcy.

## CONCLUSION OF LAW

■ Exceeding credit card limits is not *ipso facto* proof of intent to obtain money or property by false pretenses, false representations, or fraud in violation of 11 U.S.C. § 523(a)(2)(A). This court has addressed the factual question in past years in numerous cases. Dischargeability has been denied in cases of a wanton and irresponsible use of credit limits. See *The First National Bank of Dayton v. Barte*, Case No. 73 1561D (1974). Dischargeability has not been denied where there is no evidence that the credit was used on the eve of bankruptcy unusually or in contemplation of defaulting in payments or filing bankruptcy. See *The Winters National Bank & Trust Co. v. Robert N. Smith*, 1 B.C.D. 1630 (1975).

■ While the mere failure of one who purchases on credit to subsequently be able to pay for the same is not enough to deny a discharge, we believe that the facts of this case go beyond a subsequent inability to pay. See also *Brooks v. Pitts*, 24 Ga.App. 386, 100 S.E. 776. The record shows that the defendant was contemplating bankruptcy as early as January 16, 1980. The defendant's husband lost his job only five days after the last major purchase. We cannot ignore the fact that the defendant had consistently stayed around the $500.00 credit limit in her dealings with Master Charge, and then, from January 3 through 17, 1980, she conducted transactions amounting to $1,500.00. We believe this striking divergence from past practices coupled with the defendant's statements to the plaintiff on January 16 that she was in the process of filing for bankruptcy are evidence of the defendant's state of mind surrounding these purchases. We are convinced that the defendant went on a buying spree while contemplating bankruptcy and while knowing that her financial condition was such that she would not be able to pay for the goods. See decision this Court in *Rikes Department Store v. Barte*, Case No. 73–1561D (1974) and *In Re Black*, 373 F.Supp. 105 (E.D.Wisc. 1974). In *Barte* we held that "to require an overt misrepresentation where hopeless insolvency makes payment impossible is an unduly restricted interpretation of the purposes of . . . [the statute]."

The case of *Maas Brothers, Inc. v. Ratajczak*, 5 B.R. 583 (M.D.Fla.1980) is substantially similar to the factual situation at hand. In that case, the debtor had a credit account with the plaintiff. He had never made excessive charges on the account prior to the charges in question. Within a two month period, the debtor made approximately $1,000.00 worth of purchases from the creditor. His net income was about $500.00 per month, and he was married with a new-born child. The last purchase by the debtor was made January 12, 1980, and he visited an attorney to inquire about bankruptcy on January 30, 1980. He filed a petition in bankruptcy on February, 1980. [The Court found his financial resources to be limited at that time]. It further found that all these circumstances combined showed that the debtor made the purchases with the full knowledge that he would not be able to pay for them.

We believe the case at bar and the cases cited by this court and other courts require the same result. The record contains conflicting evidence regarding when Mrs. Wright decided to file bankruptcy and when her husband lost his job. We are not convinced that Mrs. Wright purchased $1,500.00 worth of merchandise, the majority of which was jewelry, and then suddenly found out that her husband had lost his job and, therefore, found it necessary to file for bankruptcy relief. We find that the defendant knew at the time she made the

subject purchases that she was not able to pay for the items in the future. We further find that she made the purchases without any sincere intention to pay for them.

Accordingly, it is hereby *ORDERED, ADJUDGED AND DECREED* that the plaintiff's claim in this matter be deemed nondischargeable in bankruptcy due to the circumstances surrounding the debtor's incurring the same; it is further

*ORDERED, ADJUDGED AND DECREED*, that the plaintiff is entitled to judgment against the defendant for the amount of the charges to the account for the month of January, 1980 in the amount of $1,509.17.